822 A.2d 494

Alexandra ANGELAKIS

v.

Bahman TEIMOURIAN, et al.

No. 57, Sept. Term, 2002.

Court of Special Appeals of Maryland.

May 1, 2003.

508

Cynthia E. Young, Annapolis, for appellant.

David A. Levin (David A. Roling, Wharton, Levin, Ehrmantraut & Klein, on brief), Annapolis, for appellees.

Argued before HOLLANDER, JAMES R. EYLER, KRAUSER, JJ.

KRAUSER, J.

Appellant, Alexandra Angelakis, and her husband, Dimitrios Angelakis, brought a medical malpractice action against appellees, Bahman Teimourian, M.D., and Suburban Hospital, Inc. The Angelakises claimed that the "ultrasound-assisted liposuction" performed by Dr. Teimourian on Mrs. Angelakis's abdomen and thighs at Suburban Hospital had left her scarred and disfigured, as a result of appellees' negligence. A Montgomery County jury disagreed. Finding neither the negligence nor the lack of informed consent alleged by the Angelakises, the jury returned a verdict in favor of appellees.

Mrs. Angelakis then noted this appeal,[1] contending that the circuit court erred in excluding, as a subsequent remedial measure, a post-operative letter written by Dr. Teimourian to a peer review journal. In that letter, which included a photograph of appellant's thighs and abdomen, Teimourian warned of the risks involved in performing ultrasound-assisted liposuction too aggressively on the inner thighs and abdomen. The letter, appellant claims, should not have been excluded by the circuit court as a remedial measure but admitted as either an admission or as impeachment evidence.

The circuit court's ruling, however, was a little more nuanced than that. In what appears to have been a carefully

---

1. Although the first notice of appeal filed in this case named both Angelakises, the second notice and the briefs filed thereafter identified Mrs. Angelakis as the only appellant.

calculated attempt to balance competing interests of public policy and private need, the court excluded the letter itself, as appellant contends, but permitted her to introduce the photograph, published with the letter, of her post-operative abdomen and thighs and to use the letter, without referring specifically to it, to cross-examine Dr. Teimourian.

The court's decision to exclude the letter, as a subsequent remedial measure, was initially correct. But, as the trial progressed, the propriety of that exclusion evaporated: Once Dr. Teimourian gave testimony that flatly contradicted material representations that he made in the letter, the letter was admissible as impeachment evidence. The court's failure, at that point, to permit what it had prohibited was error. But it was harmless error, since the substance of the letter was made known to the jury through Dr. Teimourian's testimony, and the photograph, which accompanied it, was introduced into evidence. That made the admission of the missive de minimis.

## The Surgery

In November 1996, appellant was informed by her gynecologist, Dr. Edward Cunningham, that she had cervical cancer. To remove the cancer, she underwent a procedure called "conization"—so named because it involves the excision of a cone of tissue. Following that operation, Dr. Cunningham recommended that she also undergo a "radical hysterectomy" to eliminate any remaining cancer cells.

She agreed to the procedure but then asked if he would also perform, at that time, a "tummy tuck," [2] as the incision for the hysterectomy could also be used for that purpose. As he was not a plastic surgeon, Dr. Cunningham referred her to a doctor who was—Dr. Teimourian. Appellant met with Teimourian, and he agreed to perform, after the hysterectomy,

---

**2.** A "tummy tuck," or an "abdominoplasty," is an "operation performed on the abdominal wall for cosmetic purposes." Stedman's Medical Dictionary 2 (27th ed.2000).

liposuction on her abdomen and inner thighs, as well as plastic surgery on her face, arms, and buttocks.

On February 11, 1997, after Dr. Cunningham completed the hysterectomy, Dr. Teimourian performed a series of surgical procedures on appellant,[3] which included traditional and ultrasound-assisted liposuction ("UAL") on her abdomen and inner thighs. Traditional liposuction begins with the introduction of a blunt flexible tube, known as a "cannula," into the fatty layer of the body through an incision. The sharp edges of the cannula's opening are then used to sheer off fatty tissue, as the cannula is passed back and forth over the area to be reduced. Because the cannula is attached to a suction device, it draws in the loose tissue as it moves back and forth.

UAL reduces fatty tissue in a different way. Instead of cutting, it emits ultrasonic sound waves to rupture cells and, in essence, melts the fat away. Unlike traditional liposuction, it generates heat and therefore has the potential to burn whatever it comes in contact with, including skin, unless used properly.

At the conclusion of the surgery, Dr. Teimourian closed the abdominal incision only to reopen it when he found the blood supply to that area was inadequate or, as he put it, "the capillary refill was not there." He left the incision open, with the intention of closing it in stages to avoid skin loss. In the meantime, the incision was covered by sterile dressings and "some local antibiotic" was applied.

On February 15, 1997, appellant was discharged from the hospital. During subsequent appointments with Dr. Teimourian, fluid was drained, and dead or "necrotic" tissue was cut away from her groin and abdomen. On February 19, 1997, cultures were taken from the incision areas, which later showed evidence of a staph infection.

---

3. The other surgical procedures performed by Dr. Teimourian on appellant included: an abdominoplasty; a lower mid blepharoplasty; a rhytidectomy; a $CO_2$ laser resurfacing of the mid-face; a suction lipectomy of the arms, flanks, and buttocks; and a dermatolipectomy of the upper thighs.

On February 23, 1997, running a temperature of over 103 degrees, appellant went to see Dr. Teimourian. A few days later, she returned, complaining of pain in her upper thighs, groin, and abdomen. After observing "areas of necrosis and infection of the abdomen and the medial thighs," Dr. Chester Haverback, an associate of Teimourian's, admitted her to Holy Cross Hospital. There, she was diagnosed with having "post-operative infections with severe cellulitis and loss of skin and subcutaneous tissue of the abdomen and both thighs."

## The Letter

After appellant's surgery, Dr. Teimourian submitted a letter, with a post-operative photograph of appellant's abdomen and thighs, to a peer review journal, *Plastic and Reconstructive Surgery*. In that letter, he warned against using ultrasound-assisted liposuction or "UAL" as aggressively as traditional liposuction and suggested that it should not be used on the abdomen and inner thighs. The photograph of appellant that accompanied the letter showed "skin loss" presumably resulting from the misuse of UAL.[4] The letter and photograph appeared in the November 1997 issue of *Plastic and Reconstructive Surgery*.

Teimourian's letter began by stating:

Ultrasound-assisted liposuction has become popular in this country within the past year. This popularity has evolved, especially, as a result of the enthusiasm on the part of the manufacturers to sell expensive equipment, and, to a certain extent, because of the endorsement of our plastic surgery society. Having used ultrasound-assisted liposuction in 150 cases, I would like to convey my observations on the use of this machine.

---

4. In addition to the photograph of appellant, two other photographs showing, respectively, "seroma" and "skin irregularities," accompanied the letter. We do not know if these photographs are of appellant, but presume they are not because neither photograph is part of the record. "Seroma" is defined as "[a] mass or swelling caused by the localized accumulation of serum within a tissue or organ." The American Heritage Stedman's Medical Dictionary 754 (2001).

It then named the medical problems associated with an aggressive use of UAL, mentioning skin loss, among other problems:

In addition to the extra expense and machine dependency associated with the use of ultrasound-assisted liposuction, there are medical problems that may occur, including seroma (Fig.1), surface irregularity (Fig.2), and **skin loss (Fig.3)** when the procedure is done as aggressively as in traditional liposuction.

(emphasis added). "Fig. 3" was a photograph of appellant's abdomen, groin, and upper thigh area captioned, "Skin loss as evidenced by skin ulcer in both inner thighs and lower abdomen."

And then it specified the areas of the body suitable for UAL and those that were not, notably, the abdomen and inner thighs:

There are some areas where I find that ultrasound-assisted liposuction is user-friendly and enhances the results of the procedure. These areas include the flank, chest roll, gynecomastia, and possibly in the treatment of obese individuals. However, use of the machine, as we know it today, for treatment of the abdomen is controversial, and in my opinion it should not be used in the neck area, inner thighs, knee, or ankles. Ultrasound-assisted liposuction does not give any superior aesthetic result.

His letter ended with the following request:

I hope the task force will set forth a recommendation with regard to the judicial [sic] use of ultrasound-assisted liposuction.

## The Trial

At trial, the Angelakises sought to show that the injuries to appellant's abdomen and inner thighs were caused by the negligent manner in which Dr. Teimourian performed UAL. Their medical expert, Craig Dufresne, M.D., testified that, as a result of Teimourian's negligence in performing UAL, appellant sustained burns to her abdomen and thighs. Because

these burns caused tissue death, they were, according to Dr. Dufresne, "a major contributing factor" to appellant's infections and resulted in significant skin loss to her right groin, abdomen, and thighs.

Disagreeing, Dr. Teimourian testified that he did not burn appellant and did not see any indication of burns after her surgery. He insisted that her "abdominal wound" infection was unrelated to the liposuction. He further testified that, while smoking did not cause appellant's "wounds to originate," it interfered with the "healing process." And he opined that "the thigh breakdown was a result of infection and gravity."

When asked on cross-examination whether UAL entails risks that traditional liposuction does not, Dr. Teimourian responded that, in his experience, he "did not see any difference as far as the danger of the ultrasound versus the traditional suction lipectomy." In his opinion, UAL and traditional liposuction are "interchangeable."

Later, when asked whether "the proper precaution [is] not to do UAL on the abdomen or the thigh at all," he responded that he did not see "any advantage" in using it on the inner and outer thighs. Pressed further, he added, "I don't think it's improper. There are many people who do it. In my experience, I don't like to do it."

When subsequently asked if he "incorrectly performed [the] UAL procedure on Mrs. Angelakis by doing it too aggressively," Teimourian replied, "No." It was at this point that appellant's counsel first sought to introduce Teimourian's letter, specifically because of two statements in it.

The first statement, appellant argued, was an admission by Dr. Teimourian. It stated: "In addition to the extra expense and machine dependency associated with the use of ultrasound-assisted liposuction, there are medical problems that may occur, including ... skin loss (Fig.3) when the procedure is done as aggressively as in traditional liposuction." Figure three, as noted earlier, was a photograph of appellant, captioned as "[s]kin loss as evidenced by skin ulcer in both inner

thighs and lower abdomen"; the photograph, unlike the letter, had already been admitted into evidence.

The second statement was, according to appellant, not only admissible as an admission, but as impeachment evidence. It stated: "[U]se of the [UAL] machine, as we know it today, for treatment of the abdomen is controversial, and in my opinion it should not be used in the neck area, inner thighs, knee, or ankles." Appellant claimed that this statement contradicted Dr. Teimourian's trial testimony that UAL and traditional liposuction are the same and that he did not like to perform UAL on the inner thighs.

The circuit court reserved ruling on the admissibility of the letter and allowed appellant's counsel to continue cross-examining Dr. Teimourian without directly referring to the letter. In so doing, the circuit court noted that counsel had merely asked Dr. Teimourian about "over aggressive use" of UAL and suggested that counsel ask Dr. Teimourian "if in his opinion the result that occurred in this case was the result of using the UAL as aggressively as one would use [traditional liposuction]."

Appellant's counsel then asked:

Q Dr. Teimourian, would you be able to very carefully listen to this next question and give me your answer? Do you agree that there are medical problems that may occur, including skin loss, when UAL is done as aggressively as in traditional liposuction? Yes or no.

A Yeah, I agree with that.

Q You do.

A Yeah.

Q And in fact, you have acknowledged that to your peers, have you not?

A Yes. I wrote a letter—

After questioning Dr. Teimourian about consequences of aggressively using UAL, appellant's counsel turned to the issue of performing UAL on the inner thighs.

Q And earlier today, you testified that you still, although you don't like to do it, you still do UAL in the abdomen and in the thighs, the inner thighs.

A Outer thighs I said.

Q All right. Do you not do it—

A I do not like to do inner thighs.

Q But you do it occasionally anyway, correct?

A I don't like to do the inner thighs. I use it on outer thighs mostly now.

Q All right. Sometimes you do it on the inner thighs.

A I might have done it. I don't remember the last—

Q So do you therefore take the position that UAL treatment of the abdomen is controversial, and that in your opinion it should not be used in the inner thighs at all?

A This was a—

Q Is that your position, yes or no?

A That was my position then. This is the—

Q When?

A When I wrote that article.

Dr. Teimourian then stated that he had written the letter at issue in 1997, which prompted appellant's counsel to ask:

Q In March of 1997, when you stated—without reference to any article—when you stated that medical problems may occur including skin loss when UAL is done as aggressively as in traditional liposuction, when you said that in March, did you use as an example the picture that we have been showing of Mrs. Angelakis? Yes or no.

At this point, Dr. Teimourian's counsel objected to what he believed were references to Teimourian's letter. The court cautioned appellant's counsel but permitted him to resume questioning.

Q Do you agree that medical problems that occurred with respect to skin loss in this case shown in that picture occurred because the procedure that you did on Mrs. Angelakis was done as aggressively as in traditional liposuction?

A This is her picture. That is my—

Q Yes or no.

A I agree with that writing, there.

Q Do you agree—I am not talking about the writing. I am agree [sic] if it is your opinion, your conclusion that what is shown in that picture involving Mrs. Angelakis, the skin loss that is shown there on both the thighs and the abdomen happened because you did this procedure on her as aggressively as is done with traditional liposuction.

You did this UAL procedure on her as aggressively as is done with traditional liposuction. Yes or no.

A That's yes, with qualification there are no burns. There is not a single word that burn [sic] in that article.

Appellant's counsel again sought to introduce the letter but was again rebuffed by the circuit court. The court pointed out to counsel that Dr. Teimourian "has essentially answered all of your questions to say what he said in the article without the necessity of getting into an article that was written, and therefore getting into a good question of public policy." The court concluded, "To now let you go on to refer to some article is unnecessary."

During subsequent cross-examination, Dr. Teimourian restated his position that there was no skin loss:

Q All right. Now, Dr. Teimourian, before you had indicated that—actually, well before lunch, you said she had no skin loss in the abdomen.

A I still say that.

Q And yet a little later before lunch, you said that the skin loss that she sustained in the abdomen and both thighs, from the UAL procedure, was caused by your doing the UAL as aggressively as one would do it with standard liposuction, didn't you?

A The thigh—no, I didn't.

Q All right—

A I said the abdominal area was left open on purpose. Whenever you do the UAL and the suction lipectomy, which

was done in combination on Mrs. Angelakis, or if you do the suction lipectomy alone, without UAL, if the skin of the umbilicus doesn't reach the pubic area, you leave it open.

\* \* \*

A Abdominal incision was left open on purpose.

In light of that testimony, appellant once again moved for the admission of the letter, and the court once again denied that request. Later Dr. Teimourian again testified on cross-examination that there was no skin loss to appellant's abdomen, whereupon appellant's counsel again sought to impeach Dr. Teimourian with the letter's assertion that skin loss can result from using UAL as aggressively as traditional liposuction, as that assertion was referring to a photograph of appellant's thighs and abdomen. Declining again to admit the letter, the circuit court stated in part: "I'm convinced ... you've gotten just about everything that was said in that letter through the mouth of the witness, and you've got it in writing. Now, if he says some different things when his lawyer's talking to him, fine. You can use all of the inconsistencies in your final argument that you can find." The court further noted that "to put that letter in, which is—was clearly intended as, you know, advice to other folks, possibly even a change in his own practice based on what he saw ... and I'm going to so rule."

### Discussion

■ Appellant contends that the circuit court erred by excluding the letter as a subsequent remedial measure. The letter, appellant maintains, was not a remedial measure, and was admissible as an admission. Moreover, even if it was a remedial measure, appellant argues, the circuit court should have admitted it as impeachment evidence, once Teimourian gave contrary testimony.

To determine the law of the letter, we begin with the letter of the law. Maryland Rule 5–407 governs the admissibility of subsequent remedial measures. It provides:

(a) In general. When, after an event, measures are taken which, if in effect at the time of the event, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event,

(b) Admissibility for the other purposes. This Rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

Its template is Federal Rule of Evidence 407.[5] In drafting that rule, the Federal Advisory Committee on Rules of Evidence "offered two justifications," according to the Court of Appeals: "first, that the subsequent conduct 'is not in fact an admission, since the conduct is equally consistent with injury by mere accident or through contributory negligence,' and second, the 'social policy of encouraging people to take, or at least not discouraging them from taking, steps in furtherance of added safety.'" *Tuer v. McDonald,* 347 Md. 507, 522, 701 A.2d 1101 (1997)(quoting *Rules of Evidence for the United States Courts and Magistrates,* 56 F.R.D. 183, 225–26 (1973)).

Although neither accident nor contributory negligence has been raised as a defense by appellees, the epistolary statements at issue here are not admissions of neglect. They simply reflect what Dr. Teimourian learned as a result of performing the procedure in question. In that light, Teimourian's letter satisfies the first justification for excluding it as a subsequent remedial measure: it is not necessarily an acknowledgment of negligence.

---

**5.** Federal Rule 407 provides:

When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

More important, however, is the second justification: "the social policy of encouraging people to take ... steps in furtherance of added safety." There are, to be sure, few areas in which such a policy is more pressing than in the practice of medicine. The dissemination of information regarding the success or failure of new procedures or techniques is vital to protect the health and safety of those who may undergo the same or a similar procedure.

Nonetheless, appellant urges us to treat Teimourian's letter to *Plastic and Reconstructive Surgery* as an admission of negligence and not as a subsequent remedial measure, citing *Baltimore Gas & Electric Co. v. Flippo*, 112 Md.App. 75, 684 A.2d 456 (1996), *aff'd on other grounds*, 348 Md. 680, 705 A.2d 1144 (1998), to bolster her claim. In *Flippo*, the minor plaintiff was injured when he attempted to grab an overhanging power line of the defendant BG & E to keep from falling out of a tree in his neighbor's yard. *Id.* at 81, 684 A.2d 456. At a town meeting two weeks after the accident, a BG & E supervisor stated that BG & E would work with residents to remove "climbable trees" in their yards that were near overhead electric lines and that because "white pine trees," like the one the minor plaintiff was climbing, "have a ladder-like effect that makes them easy to climb ... BGE needs to take care of this by trimming." *Id.* at 101–02, 684 A.2d 456. Nine months after that, BG & E published guidelines containing "pre-accident practices and post-accident change of policy." *Id.* at 102, 684 A.2d 456.

The supervisor's remarks were subsequently admitted at trial over BG & E's objection that they should be excluded as a subsequent remedial measure. Pointing out that the guidelines were published many months after the supervisor's remarks, the circuit court found that "the post-accident policy changes had not been formulated as of the date of the town meeting." *Id.* at 100, 102, 684 A.2d 456. It therefore concluded that the supervisor's remarks "did not concern remedial measures taken or policies adopted after and because of" the child's accident. *Id.* at 101, 684 A.2d 456.

Since that factual conclusion was not clearly erroneous, we upheld the decision of the circuit court as to the admissibility of the supervisor's remarks. *Id.* at 102, 684 A.2d 456. But, as *Flippo* addressed only the admissibility of informal statements of existing policies, we can draw no lessons from it here. Teimourian's letter articulated a change in procedure, not a rehash, as in *Flippo,* of current practices.

Another feature which distinguishes this case from *Flippo* or, for that matter, every Maryland case that has heretofore addressed this question, is that the letter at issue does not implement a change in policy, but merely reflects one. Unlike the belated guidelines in *Flippo,* or the change of hospital protocol in *Tuer,* of which we shall say more later, the letter does not assist the issuer in effecting any change in policy, practice, or procedure. In that respect, its ambitions are rather modest. But, in another respect, its purpose is grander as it seeks to affect the practices of others, who may be unaware of the risks involved in aggressively applying this procedure.

The letter, to be sure, does reflect a change in Teimourian's procedures—and probably on that basis alone could be deemed a "subsequent remedial measure." But there was no reason to publish it, except to alert others to the dangers of using ultrasound-assisted liposuction too aggressively on certain parts of the body. We do not think that fact precludes the letter from being a subsequent remedial measure. In fact, precisely because it serves that purpose, it falls within the ambit of Maryland Rule 5-407. To rule otherwise would halt the flow of admonitory publications, transmitting important and even vital information, when lawsuits are looming. That would place the public in needless peril for the sake of bestowing an evidential advantage on isolated claimants—and a short-lived advantage at that. For the publication of such corrective information will no doubt end as its usefulness to potential plaintiffs becomes known to vulnerable authors.

■ Appellant next contends that even if the letter was a remedial measure, it was admissible to impeach Dr. Teimouri-

an under Maryland Rule 5–407(b) once he gave testimony at trial which contradicted statements in the letter. In rejecting that contention, the circuit court relied on *Tuer v. McDonald,* 347 Md. 507, 701 A.2d 1101 (1997).

In that case Tuer, a patient awaiting coronary bypass surgery, began to suffer chest pains. His surgery was re-scheduled and he was given Heparin, "an anti-coagulant, to help stablize the angina." *Id.* at 509, 701 A.2d 1101. On the day of the operation, the Heparin was discontinued a few hours before the surgery was to begin, in accordance with hospital protocol and at his surgeon's direction, "to allow the drug to metabolize so that Mr. Tuer would not have an anticoagulant in his blood when the surgery commenced." *Id.* at 510, 701 A.2d 1101.

Unfortunately, Tuer's surgery was then delayed another three to four hours. During that delay, Tuer developed arrhythmia and shortness of breath and then went into cardiac arrest. Despite efforts to save him, Tuer died the next day. *Id.* Following his death, the hospital "changed the protocol with respect to discontinuing Heparin for patients with unstable angina." Instead of discontinuing Heparin several hours before surgery, the new protocol required that Heparin be given such patients until they are taken into the operating room. *Id.* at 510–11, 701 A.2d 1101.

In the medical malpractice action that followed, Tuer's surgeon testified that he considered restarting the Heparin after surgery was postponed, but then rejected the idea as too dangerous. To impeach that testimony, the plaintiffs, Tuer's family, sought to introduce evidence of the change in the protocol to show that it was both feasible and safe to restart the Heparin once the surgery was delayed. Denying their request, the circuit court excluded the evidence as a subsequent remedial measure. *Id.* at 513–14, 701 A.2d 1101. On appeal, there was no dispute as to whether the protocol change was a subsequent remedial measure. *Id.* at 511, 701 A.2d 1101. The parties disagreed as to whether it was admissible for impeachment purposes.

Affirming the circuit court's ruling, the Court of Appeals held that the change in protocol was not admissible to impeach the doctor's testimony as to the safety of restarting Heparin. *Id.* at 531, 701 A.2d 1101. The Court explained that the doctor "was not asserting ... in any absolute sense, that restarting the Heparin would have been unsafe but only that, given the complications that could have arisen ... there was a relative safety risk that, at the time, he and the hospital believed was not was worth taking." *Id.* at 529, 701 A.2d 1101. The change in protocol, the Court stated, only suggested that the doctor "and his colleagues reevaluated the relative risks in light of what happened to Mr. Tuer and decided that the safer course was to continue Heparin." *Id.* at 532, 701 A.2d 1101. "That kind of reevaluation," the Court asserted, "is precisely what the exclusionary provision of the Rule was designed to encourage." *Id.*

The Court of Appeals concluded in *Tuer* that the nature of the purported contradiction did not warrant impeachment by introducing evidence of the defendants' remedial measure. We reach the same conclusion here, at least as to Dr. Teimourian's testimony that he does not like to do UAL on the inner thighs and that UAL and traditional liposuction are interchangeable. Those statements, contrary to appellant's argument, do not justify the introduction of his statement in the letter that UAL should not be done on the inner thighs, particularly as he later explained: "That was my position then.... When I wrote that article."

■ But we reach a different result as to his testimonial insistence that no skin loss occurred. That statement was flatly contradicted by the statement under one of the photographs which accompanied the letter. The photograph showed appellant's ulcerated inner thighs and lower abdomen. Underneath that photograph were the expository words: "Skin loss as evidenced by skin ulcer in both inner thighs and lower abdomen." Moreover, referring to that photograph, which is designated "Fig. 3," the letter states, "there are medical problems that may occur, including ... skin loss (Fig.

3) when the procedure is done as aggressively as in traditional liposuction." In other words, the photograph of appellant's inner thighs and lower abdomen illustrated the loss of skin that results from the aggressive application of ultrasound-assisted liposuction.

■ In light of this, Teimourian's subsequent testimony that appellant had not suffered skin loss strains credulity and the letter, with its conflicting admission, should have been available for impeachment purposes. Nonetheless, we conclude that the circuit court's failure to allow the letter to be used as impeachment evidence was harmless error, because Dr. Teimourian testified to the substance of the letter and the photograph, graphically depicting appellant's skin loss, was admitted into evidence.

■ We reach that conclusion guided by the following principles. First, Maryland Rule 5–103(a) provides that "[e]rror may not be predicated upon a ruling that admits or excludes evidence unless the party is prejudiced by the ruling." Second, " '[T]he admission or exclusion of evidence is a function of the trial court which, on appeal, is traditionally viewed with great latitude.' " *Commercial Union Insurance Co. v. Porter Hayden Co.*, 116 Md.App. 605, 641, 698 A.2d 1167 (1997)(quoting *Swann v. Prudential Ins. Co.*, 95 Md.App. 365, 374, 620 A.2d 989 (1993)). And third, " '[A]n appellate court will only reverse upon finding that the trial judge's determination was both manifestly wrong and substantially injurious.' " *Id.* (quoting *Swann*, 95 Md.App. at 375, 620 A.2d 989).

Appellant has not shown that she was prejudiced by the exclusion of Teimourian's letter. As noted earlier, appellant sought to admit two assertions of the letter: one stating that medical problems such as skin loss may occur when UAL is "done as aggressively as in traditional liposuction," and the other stating that, in Teimourian's opinion, UAL "should not be used in the neck area, inner thighs, knee, or ankles." But, as the circuit court correctly observed, Dr. Teimourian testified as to the substance of those statements.

At trial, plainly referring to statements made in the letter at issue, appellant's counsel asked Dr. Teimourian whether he agreed that "there are medical problems that may occur, including skin loss, when UAL is done as aggressively as in traditional liposuction." In response, Dr. Teimourian stated, "Yeah, I agree with that." He than added that he "wrote a letter," acknowledging that to his peers. Later, during cross-examination, Dr. Teimourian admitted that he had performed UAL on appellant "as aggressively as is done with traditional liposuction." That admission occurred in the context of the following exchange:

Q Do you agree that medical problems that occurred with respect to skin loss in this case shown in that picture occurred because the procedure that you did on Mrs. Angelakis was done as aggressively as in traditional liposuction?

A This is her picture. That is my—

Q Yes or no.

A I agree with that writing, there.

Q Do you agree—I am not talking about the writing. I am agree [sic] if it is your opinion, your conclusion that what is shown in that picture involving Mrs. Angelakis, the skin loss that is shown there on both the thighs and the abdomen happened because you did this procedure on her as aggressively as is done with traditional liposuction.

You did this UAL procedure on her as aggressively as is done with traditional liposuction. Yes or no.

A That's yes, with qualification there are no burns. There is not a single word that burn [sic] in that article.

Appellant contends, however, that here Dr. Teimourian was testifying merely that he performed the UAL as aggressively as would have been done with traditional liposuction, and not that skin loss resulted from doing so. Even if that is so, the link between aggressive application of UAL and skin loss was established by Teimourian when he testified that he wrote "a letter" that "there are medical problems that may occur, including skin loss, when UAL is done as aggressively as in traditional liposuction." In addition to these statements, the

jury had before it the photograph from the letter depicting skin loss. Thus, in light of his testimony and the physical evidence introduced, the letter at issue was reduced to cumulative evidence.

Appellant also contends that the exclusion of the letter prejudiced the effectiveness of her counsel's closing argument. Specifically, she argues that in closing argument, her counsel avoided reference to conflicting statements about skin loss, because the circuit court warned that "with regard to skin loss, there may not be an evidentiary basis to argue that conflicting statements were made by Appellee." Even if this is true, any error was harmless.

Clearly referring to her skin loss, her counsel told the jury that "given the admission by Dr. Teimourian that what is shown in those pictures happened as a result of his using the UAL as aggressively as he would traditional liposuction, . . . we ask only that you make that finding based upon the fact that the evidence is not only tipped slightly in her favor, but is overwhelmingly in her favor that what happened to her happened as a result of the surgery that the doctor performed." "[A]ccording to Dr. Teimourian," counsel continued, "what is shown in those pictures happened, out of his own mouth, as a result of using that UAL as aggressively as he would have used standard liposuction." He later added, "I don't choose to call Dr. Teimourian a liar. In fact, I choose to call him a truth-teller when he says that the reason that this happened was because he used the UAL as aggressively as he would have used [traditional liposuction]." Thus, the exclusion of the letter did not appear to have much impact on closing argument.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**